UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 12-21773-CIV-GOODMAN

LANIISE MISHELLE WRIGHT,

Plaintiff,

vs.

CAROLYN W. COLVIN
Acting Commissioner of Social Security[1]
Administration,

Defendant.
_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This Cause is before the Undersigned on cross-motions for summary judgment by Plaintiff Laniise Mishelle Wright ("Wright"), [ECF No. 26], and Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner"), [ECF No. 32].

An Administrative Law Judge (the "ALJ") determined that Wright was not disabled. Wright seeks judicial review of the ALJ's decision, arguing that the ALJ's

---

[1]    Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Under Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  Section 405(g) of the Social Security Act specifically allows Social Security appeals cases to continue when there is a change in Commissioners.  42 U.S.C. § 405(g).

method of selecting a medical expert led to an improperly biased hearing. For the reasons set out below, the Undersigned finds that substantial evidence supports the ALJ's determination and that the ALJ applied the proper legal standards in making his decision. Accordingly, the Undersigned **affirms** the Commissioner's decision, **denies** Wright's summary judgment motion [ECF No. 26], **grants** the Commissioner's summary judgment motion [ECF No. 32], and enters **final judgment** in favor of the Commissioner.

## I.     BACKGROUND

### A. <u>Procedural History</u>

On May 7, 2008, Wright filed an application for Supplemental Security Income disability benefits. (R. 172-174).[2] Her application was denied initially and then, upon reconsideration, denied again. (R. 98-102; R. 104-106). She then requested a hearing before an ALJ to review her claim. (R. 107). The ALJ held two hearings and then issued his written decision. (R. 19-39). The ALJ found that while Wright suffers from severe physical and mental impairments, she has the residual functional capacity to perform a partial range of light work and that such jobs exist in significant numbers in the national economy. (R. 21; 28; 38). For these reasons, the ALJ denied Wright's claim for Social Security Insurance disability benefits.

---

[2]     References to "R. _" are to pages of the transcript of the administrative record.

Wright requested an Appeals Council review of the ALJ's unfavorable decision. (R. 14-15). The Appeals Council declined her request to review the ALJ's decision, making it the final decision of the Commissioner. (R. 1-6). Wright then filed this action seeking judicial review of the Commissioner's decision. [ECF No. 1]. The Commissioner answered [ECF No. 15] and Wright filed her summary judgment motion. [ECF No. 26]. The Commissioner filed a competing summary judgment motion, which also doubled as a response to Wright's summary judgment motion. [ECF No. 32; ECF No. 33].[3] Wright did not respond or reply to the summary judgment motion or the response, and the time to do so has now expired.

### B.  Facts

**1.** *Wright's Testimony*

Wright is 43 years old. (R. 498). She alleges onset of disability as of May 15, 2005, claiming that knee problems, asthma, depression, and high blood pressure have kept her from working. (R. 195-200). At the March 2011 hearing,[4] Wright testified that she generally spent her days watching television in her room, though she occasionally goes to church and medical appointments. (R. 544, 546). Wright's testimony shows that she is able to prepare her own meals if necessary, but that her daughter does most of the cooking and household chores. (R. 545). She uses public transportation to travel. (R.

---

[3]     It appears that the Commissioner filed her summary judgment brief twice, at ECF Nos. 32 and 33.  The filings are identical.

[4]     The ALJ conducted two hearings, one in March 2011 and the other in July 2011. (R. 46-90; 534-567).

542). She testified that she completed ninth grade and is able to read and write, but not very well. (R. 541). The record indicates that while she was in school, Wright was enrolled in language and mathematics classes for the learning disabled. (R. 63). At the time of the March 2011 hearing, she was taking Motrin for pain but no prescription medications. (R. 554).

At the July 2011 hearing, Wright testified that she smokes marijuana only occasionally despite having admitted to two doctors that she smoked marijuana *daily* for the past 20 years. (R. 54-55; 332; 499). Wright also testified that she drinks alcohol occasionally. (R. 55). In terms of employment, Wright stated that she worked at the Convention Center for a few weeks making food at some unspecified time and as a file clerk in the health department for one summer, also at an unspecified time. (R. 68-69). She previously stated to an evaluating doctor that she also worked as a housekeeper for six months at some point, but that she had not worked anywhere since 2007. (R. 499). Wright also reported that she was sentenced to 364 days in the Dade County jail in 1993 for selling drugs, during which time she was diagnosed with depression. (R. 499).

2. *Physical Impairments*

i. <u>Consultative Examiner - Dr. Daviglus</u>

On July 1, 2008, Wright was examined by Dr. George Daviglus for knee pain. (R. 338-344). Dr. Daviglus noted that Wright was well-developed, well-nourished, cooperative, moderately obese, and had no apparent distress. (R. 338). She was well-

dressed, well-groomed, and exhibited a normal affect. (R. 339). A musculoskeletal examination found that Wright had full range of motion in her joints, a normal gait, and no issues with her spine. (*Id.*) She had full range of motion in her extremities, good muscle strength and tone, and normal motor and sensory responses. (*Id.*) Dr. Daviglus' impression was that Wright had bilateral knee arthralgias, hypertensive cardiovascular disease, a depressive disorder, and exogenous obesity. (R. 340). Dr. Daviglus concluded that while Wright did have a history of pain in her knees which limited her ability to walk and climb stairs, she "ha[d] no specific localizing signs other than obesity and [] depressive disorder." (*Id.*)

ii.   Camillus Health Concern

In September 2010, Wright went to Camillus Health Concern ("Camillus") for medical treatment. (R. 466). She reported that she had been treated at QualMed, but lost Medicaid coverage and wanted to re-start treatment. (*Id.*) She noted that she had been taking Paxil for depression and wished to continue with treatment. (*Id.*) She also indicated that she had a history of hypertension and was taking Lisinopril. (*Id.*) Wright reported smoking both cigarettes and marijuana, and admitted that she had smoked marijuana the day before the exam. (*Id.*) A pulmonary exam revealed no dyspnea or cough. (R. 467). Records from the time show that she was awake, alert, well-appearing, well-developed, and well-nourished. (*Id.*)

In October 2010, Wright returned to Camillus. (R. 461). At that time, she was taking Lisinopril for hypertension, but no other medication. (*Id.*) She again reported using marijuana regularly. (*Id.*) She was scheduled for an appointment for medication re-fills on November 29, 2010, but was not there when her name was called. (R. 457). Although the ALJ suggested she did not show up for the appointment at all, the record indicates that she did arrive later to pick up her medications and re-schedule an appointment that she missed the week before. (*Id.*)

On December 7, 2010, Wright was seen at Camillus for a mammogram and reported at that time that she had run out of her medications. (R. 455). The mammogram results were not completed at that point and she was instructed to undergo further imaging. (*Id.*) The facility's notes from the visit describe her as well-appearing and under no acute distress. (*Id.*) She visited several times in January 2011 to refill prescriptions and was diagnosed and treated for insomnia. (R. 450-454). She also reported that she had quit smoking six months earlier. (R. 451).

On May 2, 2011, Wright was seen for complaints of a dry cough. (R. 516.) She reported that her blood pressure medications had run out a week earlier. (*Id.*) A physical examination was performed and showed nothing remarkable. (*Id.*) Her gait and stance were described as normal. (R. 517).

On July 11, 2011, Wright was seen for a hypertension follow-up exam and revealed that she had increased asthma symptoms. (R. 511-512). However, a respiratory

exam revealed no wheezing, rhonchi, or rales. (R. 513). She was advised to quit smoking, which she apparently resumed despite her statement months earlier that she had quit. (R. 514).

### iii.   Consultative Examination – Dr. Millheiser

On January 3, 2011, Wright was given an orthopedic evaluation by Dr. Peter Millheiser. (R. 434-445). A lumbar spine examination revealed that while Wright had marked restriction of motion in her lumbar spine, her motor and sensory examinations were normal. (R. 436). He further noted the following: there were no trigger points, spasm, list, tilt, or sciatic scoliosis; a motor and sensory test of the lower extremities was normal; knee and ankle reflexes were equal and active bilaterally; straight leg raising was negative sitting and positive at 70 degrees bilaterally when she was supine; she was not using an orthopedic appliance; she displayed a normal ability to get on and off the examining table; and she had an antalgic gait favoring the right side while walking with a cane. (R. 436). X-Rays indicated a decrease in the L5-S1 disc space. (*Id.*)

A bilateral shoulder exam revealed the following: the shoulder was nontender; the impingement sign was negative; there was no clinical instability; no atrophy in the arms or forearms; and no swelling, erythema, clicking, popping, grinding, or repitus. (*Id.*) Dr. Millheiser found large scars on Wright's shoulders from stab wounds. (*Id.*) There were no abrasions or ecchymoses and her range of motion was normal; there were no trigger points; her AC and sternoclavicular joints were unremarkable; the

7

clavicle, acromion, and scapula were normal; and she had pain with motion in the left shoulder. (*Id.*)

A bilateral knee exam revealed the following: tenderness wherever Wright was touched; a normal range of motion; a normal gait; that no assistive device was used for ambulation; that there was no atrophy of the thighs or calves, and no swelling, effusion, erythema, clicking, popping, grinding, synovial thickening, or crepitus. (*Id.*) X-Rays revealed minimal patellofemoral degenerative changes in the knees. (*Id.*)

After the examination, Dr. Millheiser diagnosed Wright with post-stab wounds on both shoulders, chronic back pain, and bilateral knee pain. (R. 436). Dr. Millheiser concluded that Wright's hypertension would be helped by significant weight loss and that she was physically capable of doing reasonable work activity, but that she should not walk more than four hours a day or lift more than 40 pounds. (R. 437).

### 3.   *Mental Impairments*

#### i.   Consultative Examination - Dr. Desdin

Dr. Robert Desdin performed Wright's initial psychiatric consultative evaluation on June 30, 2008. (R. 330-337). During the exam, Wright reported that she had a tenth grade education and had been in special education classes for reading and math. (R. 330). Wright stated that she had no history of psychiatric care and was not taking any psychotropic medication. (*Id.*) She was able to care and cook meals for herself, although she had some difficulty standing for extended periods of time. (R. 335). Dr. Desdin

found that Wright's sensorium was clear and she was oriented to person, place, and time. (R. 333). She also was dressed appropriately and was well-groomed. (*Id.*) She was able to communicate effectively using fluent speech, a normal voice, and adequate expressive and responsive language. (*Id.*) Her affect was described as depressed and anxious. (*Id.*) Dr. Desdin found that her attention and concentration, as well as her recent and remote memory, were moderately to severely impaired; her cognitive functioning was below average; and her insight and judgment were poor. (R. 333-334). Dr. Desdin noted that Wright reported flashbacks related to sexual abuse as a child from her mother's boyfriend, and, potentially, from her brother as well. (R. 331).

Dr. Desdin diagnosed Wright with a major depressive disorder with psychotic features, a cannabis dependence/abuse disorder, and borderline intellectual functioning. (R. 335). Dr. Desdin found that Wright's psychiatric, substance abuse, and cognitive problems interfered with her ability to function on a daily basis and that "[h]er prognosis is poor given [her] limited intellectual ability, history of sexual abuse, and depressive symptoms which she had for many years." (*Id.*)

    ii.   <u>DDS Reviewing Psychologist – Dr. Catherine Nunez</u>

On July 28, 2008, DDS reviewing psychologist Catherine Nunez, Ph.D., reviewed Wright's medical records and completed a Psychiatric Review Technique. (R. 375-388). Dr. Nunez indicated that Wright had an affective and substance abuse disorder. (R. 378; 383). Dr. Nunez opined that this resulted in mild restrictions on Wright's daily living

activities, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 385). Dr. Nunez concluded that "overall, [the] claimant appears capable of completing simple tasks, follow[ing] simple instructions and complet[ing] simple tasks from a mental perspective." (R. 387).

iii.    <u>Disability Determination Services ("DDS") Reviewing Psychologist – Dr. Christner-Renfroe</u>

On November 5, 2008, DDS reviewing psychologist Dr. Trina Christner-Renfroe, Psy.D., completed a Psychiatric Review Technique that yielded an opinion similar to that of Dr. Nunez. (R. 415-428). Dr. Christner-Renfroe opined that Wright had an affective disorder and a substance abuse disorder. (R. 415). Dr. Christner-Renfroe found that Wright had moderate restrictions on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, but had not experienced any episodes of decompensation. (R. 425).

iv.    <u>Consultative Examination - Dr. Marban</u>

Following the March 2011 hearing, Wright was sent for a consultative psychological exam with Dr. Elsa Marban. (R. 496-509). The exam took place on April 11, 2011. (R. 496). Wright traveled to the exam using public transportation and was appropriately dressed and groomed. (R. 497). During the examination, Wright reported that she was having difficulty with her knees and indicated she was not getting along with others. (*Id.*) She recounted parts of her childhood, including sexual abuse by her

mother's boyfriend and dropping out of school in ninth grade after excessive fighting. (R. 498). She also disclosed that she had been in jail for 364 days in 1993 for selling drugs and was currently using marijuana daily and drinking beer each weekend. (R. 499).

Dr. Marban's exam revealed that Wright was oriented to person, place, and time. (R. 500). Her immediate and recent memory was poor, but her remote memory was fair. (R. 501). She exhibited a poor fund of information, demonstrated poor calculation abilities, and had poor abstract reasoning capabilities. (*Id.*) She had poor insight into her cognitive deficits but demonstrated fair judgment on formal testing. (*Id.*)

Dr. Marban administered the WAIS-IV (Wechsler Adult Intelligence Scale). (R. 502). Wright obtained a Full Scale IQ score of 46, and her verbal and non-verbal reasoning skills were described as being in "the extremely low range."[5] (R. 503). Dr. Marban noted that Wright became easily distracted during the exam and "was not motivated to do well and gave up easily on more difficult subtests." (R. 501). According to Dr. Marban, Wright had "limited motivation to complete tasks." (R. 506). She "was able to follow two to three step instructions; however, she would require increased time

---

[5]    Wright's counsel attempted to submit an interrogatory to Dr. Marban to determine whether, "[i]f the Claimant never touched cannabis again, would her mental retardation improve?" (R. 299). There is no record that the interrogatory was sent and Wright claims that the ALJ instead ordered a supplemental hearing to gather more information. [ECF No. 26, p. 8-9]. For the reasons outlined below, the Undersigned does not believe such action, if true, would mean that the adjudication process was somehow biased or that the ALJ's decision was not supported by substantial evidence.

and attention to learn work skills." (*Id.*) Dr. Marban concluded that "[w]ith vocational training, abstinence from drugs, and mood stabilization, she may be able to work at an unskilled position in the future." (*Id.*)

Dr. Marban diagnosed Wright with an unspecified mood disorder, a cannabis dependence disorder, and moderate mental retardation. (R. 505). Dr. Marban found that Wright was not competent to manage her finances due to her substance abuse and was unable to perform basic arithmetic. (*Id.*)

v.   <u>Medical Expert - Dr. Strahl</u>

Dr. Strahl, a board-certified psychiatrist, testified as a medical expert at the July 2011 hearing. (R. 46-90). Dr. Strahl opined that Wright's substance abuse "greatly and gravely" influenced the formal IQ testing performed by Dr. Marban. (R. 59). Dr. Strahl opined that Wright's true IQ was likely in the borderline intellectual functioning range, not the mentally retarded range. (R. 73). Dr. Strahl based this opinion on Wright's previous ability to work at a level that would not be indicative of mental retardation and the fact that her daily marijuana use likely hindered her motivation to do well on the IQ test. (R. 72-73).

Wright's counsel objected to Dr. Stahl's testimony on two grounds. (R. 303; 309). First, counsel objected to the way that Dr. Stahl was chosen as the medical expert. (*Id.*) Counsel suggested that by eliminating certain psychologists that the ALJ did not deem credible, he was introducing bias into the hearing process. [ECF No. 26, p. 6]. Second,

Wright objected to Dr. Strahl testifying telephonically, but did not suggest why this would prejudice the proceeding. (R. 303; 309).

4. *Vocational Experts*

i.   Vocational Expert – Lorin Lovely

Lorin Lovely, a mental health practitioner and medical  social worker, testified as the vocational expert at the March 2011 hearing. (R. 126, 556-62). Lovely testified that an individual in Wright's position could work as a lens inserter, table worker, or umbrella tipper. (R. 559-60). According to Lovely, and in response to a question from the ALJ, only the table worker position measures performance using means other than production goals or quotas. (R. 560). Lovely also testified that Wright's job possibilities were significantly reduced because Wright was limited to only occasional interaction with others. (R. 562).

ii.   Vocational Expert – Gary Fannin

Gary Fannin, testified at the July 2011 hearing about Wright's education records, the Dade County Public Schools special education programs, and Wright's ability to work. (R. 63-90). Fannin worked at Dade County Public Schools for 20 years and testified that Wright's school records indicated that she was enrolled in Special Learning Disability ("SLD") classes for math and language arts. (R. 63). Fannin also testified that a student with Wright's IQ (as tested by Dr. Marban) would "definitely not be put into an LD learning disability program," because she could not meet the

demands of the classes. (R. 64).   In addition, Wright was placed in a number of mainstream classes, which would conflict with her tested IQ score. (R. 66-67).

Fannin testified that although Wright worked at several different jobs in the past, her earnings did not rise to the level of substantial gainful activity. *(*R. 77). Despite this, Fannin found that there were significant jobs in the national economy for an individual with Wright's age, education, work experience, and residual functional capacity. (R. 78-79). Some of the jobs specifically listed by Fannin include: food and beverage clerk, charge account clerk, credit authorizer, cashier II, and ticket seller. (R. 39). These jobs, according to Fannin, require no more than a third or fourth grade education. (*Id.*)

## II.    APPLICABLE LEGAL PRINCIPLES

### A.  <u>Standard of Review</u>

In reviewing the Commissioner's final decision, the court's role is limited to determining whether there is substantial evidence in the record to support the decision and whether the Commissioner correctly applied the appropriate legal standards. 42 U.S.C. § 405(g); *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

The Commissioner's decision must be affirmed if it is supported by substantial evidence in the record. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (internal citations omitted). Substantial evidence is more than a scintilla, but less than a preponderance; "it means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *McRoberts*, 841 F.2d at 1080 (internal citations and quotations omitted). In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account both favorable and unfavorable evidence. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citation omitted). The court, however, must not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239 (internal citations omitted). Thus, "[e]ven if [the court] find[s] that the evidence preponderates against the [Commissioner's] decision, [the court] must affirm if the decision is supported by substantial evidence." (*Id.*)

Unlike the deferential standard of review applied to the Commissioner's findings of fact, "[n]o presumption of validity attaches to the [Commissioner's] determination of the proper legal standards to be applied in evaluating claims." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Wiggins,* 679 F.2d at 1389). The Commissioner's "[f]ailure to apply the correct legal standards or to provide the reviewing court with the sufficient basis to determine that the correct legal principles have been followed is grounds for reversal." *Wiggins*, 679 F.2d at 1389.

**B.  The Sequential Evaluation**

To determine whether a plaintiff is disabled, the Commissioner must undertake a five-step sequential analysis. The Commissioner must first determine whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b),

416.920(b). In the second step, the Commissioner must determine whether the plaintiff suffers from a severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the Commissioner determines whether the plaintiff's impairments meet or equal a listed impairment under 20 C.F.R. §§ 404, App. 1, 404.1520(d), 416.920(d).[6] If so, then the plaintiff is considered disabled. At step four, the Commissioner must determine whether the plaintiff's impairments prevent the plaintiff from performing his or her past relevant work. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).  If the answer is yes, then a prima facie case of disability is established. The burden shifts to the Commissioner to show, at step five, that there is other work that the plaintiff can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); 20 C.F.R. § 404.1560(c).  The Commissioner must then determine whether the plaintiff is actually capable of performing other work within the economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).   The following flow chart illustrates the five-step sequential analysis.

---

[6]      "Certain impairments are so severe either when considered alone or in conjunction with other impairments that, if such impairments are proved, the regulations require a finding of disability without further inquiry into the [plaintiff's] ability to work." *Gibson v. Heckler*, 762 F.2d 1516, 1518 (11th Cir. 1985).



III.   **ANALYSIS**

Wright argues in her Motion for Summary Judgment that the proceedings before the ALJ were biased and so the Commissioner's decision should be reversed, or, alternatively, that her case should be remanded for further administrative proceedings. [ECF No. 26, pp. 5, 11]. First, Wright claims that she was not given a fair and unbiased hearing because the ALJ improperly disqualified certain medical experts and allowed Dr. Strahl to testify telephonically.[7] Second, Wright claims that, but for the biased hearing, she would have met or equaled the listing to be classified as disabled.[8] The Undersigned addresses each argument in turn below.

   A.  <u>Wright Received an Unbiased Hearing</u>

      1.  **Wright Offers No Support For Her Claim that the ALJ Disqualified and Eliminated Other Psychiatrists in Favor of Dr. Strahl.**

Wright claims that she did not receive an unbiased hearing because "the ALJ disqualified other psychiatrists on the approved list in favor of Dr. Strahl." [ECF No. 26, p. 5]. Under implementing regulation 20 C.F.R. § 404.940, "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any

---

[7]    Wright's brief focuses nearly entirely on the medical expert disqualification issue, though it does reference the telephonic appearance issue as well, and so both are addressed here.

[8]    The Undersigned finds that, because Wright's motion for summary judgment focuses solely on the issue of whether Dr. Strahl's testimony regarding Wright's mental capacity somehow biased the hearing process, the ALJ's determination that Wright is physically able (as opposed to mentally able) to perform some light work is supported by substantial evidence. [ECF No. 26].

party or has any interest in the matter pending for decision." Wright claims that the ALJ in this case was prejudicial because he did not want to hear from certain psychiatrists on the approved list. [ECF No. 26, p. 5]. According to Wright, this "shows a prejudice or at the very least being partial towards Dr. Strahl over other doctors." (*Id.*)

The burden for proving bias in cases such as this one is steep. Conclusory allegations and speculation are not enough to support a finding that the ALJ was biased. For instance, "[b]ias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it in **for the party** for reasons unrelated to the officer's view of the law...." *Keith v. Barnhart*, 473 F.3d 782, 789 (7th Cir. 2007) (emphasis added) (citing *McLaughlin v. Union Oil Co.*, 869 F.2d 1039, 1047 (7th Cir. 1989) (citations omitted)). As the Government correctly noted, Wright never presented any objective data to support her claim that Dr. Strahl was improperly selected. [ECF No. 32, pp. 5-6]. The only evidence that Wright offers is counsel's personal experience and speculation between lawyers and experts that counsel would "bump into." (R. 49). Such speculation is not enough to show specific bias against Wright.

In support of her argument, Wright cites to the Social Security Administration's Hearing, Appeals and Litigation Law Manual ("HALLEX").[9] HALLEX "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims at the hearing, Appeals Council, and civil action levels." HALLEX §

---

[9]     HALLEX is publicly available at http://ssa.gov/OP_Home/hallex/hallex.html.

I-1-0-1. Wright specifically cites to the section which provides that an ALJ must select a medical expert who is maintained on a regional office's roster, in rotation, to the extent possible. HALLEX § I-2-5-36(D). Wright alleges that the ALJ did not follow the HALLEX procedures in selecting Dr. Strahl, and, as a result, Dr. Strahl should not have been selected as the medical expert in the present case. Wright claims that his selection as the medical expert resulted in a biased hearing.

In making this claim of bias, however, Wright fails to account for the specific HALLEX provision that *allows* ALJs to exclude certain experts from testifying. According to HALLEX, "[a]n ALJ may request that the State agency *not* use a particular treating, nontreating, or other medical source to conduct a CE or test if he or she has a good reason." HALLEX, § I-2-5-20(C) (emphasis added). The ALJ explained this procedure to Wright at the hearing. (R. 50). Specifically, the ALJ advised Wright's counsel, in response to his objection to Dr. Strahl, that he does not affirmatively select the experts; he merely selects a specialty. Although an ALJ may advise that he or she does not want to use a specific doctor, the ALJ cannot pick a particular doctor and the ALJ did not select Dr. Strahl for this case. In fact, he explained that "why they pick Dr. Strahl is unknown to me." (R. 50).

Wright does not claim that the ALJ did not have a good or sufficient reason to exclude other medical sources, she simply claims that their exclusion introduced bias. The Undersigned is not persuaded by this position. There is no evidence in the record

20

that the ALJ violated any HALLEX procedure. The ALJ had the right to exclude certain experts and his candid, on-the-record admission that he had done so is not evidence of bias.

Wright's contention that *Reed v. Massanari*, 270 F.3d 838 (9th Cir. 2001), supports her assertion that the ALJ introduced bias is without merit. As the Commissioner points out, *Reed* is inapposite to the present case. [ECF No. 32, p. 6]. In *Reed*, the ALJ refused the claimant's request for a consultative examination by *any* rheumatologist for lupus because the only expert available always found the claimant was disabled. *Id.* at 843. Wright fails to account for the distinction between depriving the claimant of a medical expert opinion altogether, and depriving the claimant of a medical expert opinion that may be more favorable than others. The issue in *Reed* was not whether the ALJ introduced bias by manipulating what expert was chosen, but that the ALJ "disqualified *all* of the available rheumatologists, thereby depriving Plaintiff and the agency of the benefits offered by that specialization." *Id.* at 844 (emphasis in original). Here, Wright was not deprived of an expert opinion.

Wright also cites *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996), to support her claim that the ALJ was biased. [ECF No. 26, p. 7]. In *Miles*, the 11th Circuit found that the ALJ introduced bias when he wrote that he did not find the claimant's doctor credible because the doctor almost always finds the claimant disabled. *Miles*, 84 F.3d at 1400. The Court found that this comment indicated that the ALJ was prejudiced against

the claimant and the claimant's doctor. *Id.* at 1401. The Court also noted that the claimant's earliest chance to object was to the Appeals Council, which did not address the objection, and that the claimant was thus entitled to an impartial hearing in front of a different ALJ. *Id.*

In the present case, there is no such prejudice. Wright objected almost immediately—at the hearing—to the selection of Dr. Strahl. (R. 49; 303; 309). The ALJ considered the objection and overruled it. (R. 50).  In doing so, the ALJ stated the following:

> "I can tell you that I don't get to pick my experts.  I simply put down a specialty . . . You can tell the office that there are certain doctors you don't want to hear from for any reason that you find good and sufficient.  So when I have a case like this I put down psychiatrist, I have a list of physicians that I don't like to hear from.  Why they pick Dr. Strahl is unknown to me but the fact of the matter is, is that he's a contractor, he has a contract with us and he's on a roster and they pick him."

(R. 50).

Wright's counsel took these comments as a *prima facie* case of bias. However, as the ALJ pointed out, he does not select the medical expert. The ALJ did not state that Dr. Strahl always found for the Commissioner nor that he wanted Dr. Strahl as the medical expert in all of his cases. As discussed above, Counsel offered only personal, anecdotal evidence that Dr. Strahl was selected as a medical expert more often than the procedures would ordinarily allow. (R. 49-50). Such circumstantial evidence that the proceeding was somehow biased falls

far short of that required at law.[10] *Keith*, 473 F.3d at 789 ("We have found no evidence in the record, and [claimant] does not point to any, that suggests that the ALJ failed to follow the Social Security Administration's established procedures in the case before us.  Absent such evidence, we fail to see how [the medical expert's] selection raises even the appearance of bias.").

Accordingly, the Undersigned finds that the ALJ did not prejudicially circumvent the procedure for selecting medical experts. There is no evidence that the ALJ intentionally manipulated the process for choosing a medical expert. Even if the ALJ disqualified certain experts from testifying before him, this does not amount to impermissible bias.[11] Therefore, there is substantial evidence in the record to support the ALJ's findings that Wright is not disabled.

### 2.  Medical Experts Are Permitted to Testify Telephonically in Social Security Administrative Hearings

Wright's second objection to Dr. Strahl is that he was testifying by phone. (R. 303; 309). No specific reason was given for the objection. To the extent that counsel was arguing that testifying telephonically is not permitted or is somehow unduly prejudicial, this argument is without merit. The HALLEX provision that Wright refers

---

[10]    Additionally, counsel failed to show *how* Dr. Strahl's testimony was biased. For example, no statistical evidence was given to show that Dr. Strahl's testimony would inevitably lead to a finding against the claimant.

[11]    As referenced, excluding certain experts is allowed by the HALLEX procedures. HALLEX, § I-2-5-20(C).

to in her Motion for Summary Judgment clearly provides that medical expert testimony can be heard by video conference or telephone conference. HALLEX § I-2-5-34(C). *See also* HALLEX §§ I-2-5-30, I-2-5-32. Counsel's failure to explain how this telephonic testimony prejudiced the hearing, coupled with this specific provision in HALLEX that allows for such testimony, leads the Undersigned to conclude that allowing Dr. Strahl to testify over the phone did not produce a biased proceeding.

**B.   The ALJ's Finding that Plaintiff's Mental Impairment was not Disabling is Supported by Substantial Evidence**

In her Motion for Summary Judgment, Wright requests "that Dr. Marban's opinion be accepted and benefits paid from the alleged onset date of disability." [ECF No. 26, p. 11]. Presumably, Wright wants this Court to rely on Dr. Marban's finding that she had an IQ of 46, because it would allow her to meet or equal listing 12.05(b). 20 CFR § 404, Subpart P, App. However, Dr. Marban's findings also show that Wright was not motivated to do well on the mental status examination and it may not have been an accurate test. (R. 501). Furthermore, Dr. Marban found that with vocational training, abstinence from drugs, and mood stabilization, Wright may be able to work at an unskilled position in the future. (R. 506).

The Undersigned must affirm the decision of the ALJ if it is supported by substantial evidence in the record. 42 U.S.C. § 405(g). There is substantial evidence to support the ALJ's finding that Wright's mental impairment was not disabling in this case. In his decision, the ALJ stated that Wright did not meet listing 12.05(B) because he

found "the results of the WAIS-IV to be an under-representation of the claimant's intellectual abilities." (R. 26). In making this finding, the ALJ noted that although Wright obtained a Full Scale IQ of 46 when examined by Dr. Marban, she was not motivated to do well on the exam. (*Id.*) The ALJ also took into account the fact that Wright had been in mainstream classes while attending school, which would indicate an IQ that is higher than the listing score of 59. (*Id.*) Finally, the ALJ noted that Wright's extended history of marijuana use likely limited her motivation to complete tasks. (*Id.*)

Taking this evidence into account, the Undersigned finds that the ALJ properly weighed all of the facts before determining that Wright was not disabled. The record indicates that the ALJ exhaustively combed through Wright's medical history and extensively discussed the rationale for finding that she did not meet or equal any listed impairment. (R. 22-27). The Undersigned finds that there is substantial evidence to support the ALJ's finding that Wright is not disabled.

## IV.     CONCLUSION

For the reasons stated above, the Undersigned **affirms** the Commissioner's decision, **denies** Wright's summary judgment motion [ECF No. 26], **grants** the Commissioner's summary judgment motion [ECF No. 32], and enters **final judgment** in favor of the Commissioner and against Wright.

**DONE AND ORDERED**, in Chambers, in Miami, Florida, this 11th day of July, 2014.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

All Counsel of Record